**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **MILTON J. DOUCETTE, JR. AND** | § | **CIVIL ACTION NO:** |
| **LISA M. DOUCETTE** | § | |
| | § | |
| *Plaintiffs* | § | |
| **v.** | § | |
| | § | |
| **THOR MOTOR COACH, INC.;** | § | |
| **FORD MOTOR COMPANY; AND** | § | |
| **CAMPING WORLD RV SALES, LLC** | § | |
| | § | |
| *Defendants* | § | **JURY TRIAL REQUESTED** |

<u>**COMPLAINT**</u>

**I.    Parties**

1.    Plaintiffs, MILTON J. DOUCETTE, JR. and LISA M. DOUCETTE, now and have been at all times material hereto citizens of the Blossom, Lamar County, State of Texas.

2.    Defendant, THOR MOTOR COACH, INC., hereinafter "TMC," is an Indiana corporation and citizen of the state of Indiana with its principal place of business in Elkhart County, Indiana and is the final stage assembler of the recreational vehicle that Plaintiffs purchased and is a merchant in goods of the kind involved in this case.

TMC's agent for service of process is CT Corporation System, 150 West Market Street, Suite 800, Indianapolis, IN, 46204.

3.    Defendant, FORD MOTOR COMPANY, hereinafter "FORD," is a Delaware and Michigan citizen and a corporation with its principal place of business in Wayne County, Michigan and is the engine and chassis manufacturer of the recreational vehicle that Plaintiffs purchased and is a merchant in goods of the kind involved in this case.

-1-

FORD's agent for service of process is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

4.   Defendant, CAMPING WORLD RV SALES, LLC, hereinafter "CAMPING WORLD," is a Minnesota limited liability company and a citizen of the State of Minnesota.

CAMPING WORLD is wholly owned by FreedomRoads Operations Company, LLC. FreedomRoads Operations Company, LLC is a Minnesota limited liability company and a citizen of the State of Minnesota and is wholly owned by FreedomRoads, LLC. FreedomRoads, LLC is a Minnesota limited liability company and a citizen of the State of Minnesota and is wholly owned by FreedomRoads Intermediate Holdco, LLC. FreedomRoads Intermediate Holdco, LLC is a Minnesota limited liability company and a citizen of the State of Minnesota and is wholly owned by ITM Holding Company #2, LLC. ITM Holding Company #2, LLC is a Minnesota limited liability company and a citizen of the State of Minnesota and is wholly owned by ITM Holding Company, LLC. ITM Holding Company, LLC is a Minnesota limited liability company and a citizen of the State of Minnesota and is wholly owned by FreedomRoads Holding Company, LLC. FreedomRoads Holding Company, LLC is a Minnesota limited liability company and a citizen of the State of Minnesota and is wholly owned by CWGS Group, LLC.

CWGS Group, LLC is a Delaware limited liability company and a citizen of the State of Delaware and is wholly owned by CWGS Enterprises, LLC. CWGS Enterprises, LLC is a Delaware limited liability company and a citizen of the State of Delaware and is owned by: (a) CWGS Holding, LLC; (b) CVRV Acquisition, LLC; © CWH BR, LLC; (d) Camping World Holdings, Inc.; (e) and certain individuals, none of which are known citizens of the State of Texas by the Plaintiff. CWGS Holding, LLC is a Delaware limited liability company and a citizen of the

State of Delaware and is wholly owned by ML Acquisition Company, LLC. ML Acquisition Company, LLC is a Delaware limited liability company and a citizen of the State of Delaware and is wholly owned by : (I) AGI Holding Corp.; and (ii) ML RV Group, LLC. AGI Holding Corp. is a Delaware limited liability company and a citizen of the State of Delaware and is not a publicly held corporation and no publicly held corporation owns 10 percent or more of its stock.

ML RV Group, LLC is a Delaware limited liability company and a citizen of the State of Delaware and is wholly owned by (1) Marcus Lemon who is a citizen of the State of Illinois; (2) CVRV Acquisition is a Delaware limited liability company and a citizen of the State of Delaware and is wholly owned by Crestview Partners II GP, LP. Crestview Partners II GP, LP is a Delaware limited liability partnership and a citizen of the State of Delaware. The identities of the limited partners of Crestview Partners II, LP are confidential; however, none of the limited partners are known citizens of the State of Texas by the Plaintiff; (3) CWH BR, LLC is a Delaware limited liability company and a citizen of the State of Delaware and is wholly owned by Camping World Holdings, Inc. Camping World Holdings, Inc. is a publicly traded Delaware corporation with its principal place of business in Lincolnshire, Illinois. All publicly held companies, if any, that own ten percent (10%) or more of the named party's stock: Camping World RV Sales, LLC is not a publicly held corporation; and (4) Camping World Holdings, Inc. is a Delaware publicly traded corporation, and owns greater than 10 percent of the membership interest in CWGS Enterprises, LLC, which is an indirect parent company of Camping World RV Sales, LLC.

CAMPING WORLD is authorized to do and doing business in the State of Texas whose agent for service of process is CT Corporation System, 334 North Senate Avenue, Indianapolis, Indiana 46204.

-3-

## II.   Jurisdiction

5.      This court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.  Plaintiffs are seeking a rescission of the sale under Texas DTPA §17.50(b)(3) and is seeking an order necessary to restore to him any money or property, real or personal, which may have been acquired in violation of the Texas DTPA. Plaintiffs are also seeking treble damages under Texas DTPA §17.50(b)(1), therefore, Plaintiffs's damages which will exceed $500,000.00, not including attorney fees and costs.

This court also has supplemental jurisdiction under 28 USC § 1367 over Plaintiffs's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

## III.   Venue

6.      Venue is proper in this district under 28 U.S.C. §1391(a)(3) because the Defendants are subject to personal jurisdiction in this district and there is no other district where the suit may be brought.

Venue is also proper in this district under Tex. Bus. & Com. Code §17.56.  VENUE. An action brought under this subchapter may be brought:

    (1)    in any county in which venue is proper under Chapter 15, Civil Practice and
           Remedies Code;  or

    (2)    in a county in which the defendant or an authorized agent of the defendant
           solicited the transaction made the subject of the action at bar.

Venue is also proper in this district under Tex. Bus. & Com. Code §15.033.  Breach

of Warranty By Manufacturer:

A suit for breach of warranty by a manufacturer of consumer goods may be brought in any county in which all or a substantial part of the events or omissions giving rise to the claim occurred, in the county in which the manufacturer has its principal office in this state, or ***in the county in which the Plaintiffs resided at the time the cause of action accrued***.

### IV.   Conditions Precedent

7.   All conditions precedents have been performed or have occurred.

### V.   Facts

#### A.   The Transaction

8.   On August 23, 2021, Plaintiffs purchased a new 2022 THOR WINDSPORT 35M CLASS MOTORHOME bearing VIN: 1F66F5DN3L0A13490, hereinafter "WINDSPORT," from MCKEE RV.  The WINDSPORT was purchased primarily for Plaintiffs' personal use.  The sales contract was presented to Plaintiffs at the dealership and was executed at the dealership.

9.   The sales price of the WINDSPORT was $160,801.06, excluding finance charges. Civil or Punitive penalties for breach of warranty are recoverable under the Warranty Act, if they are recoverable for breach of warranty under the applicable state law.   See ***Hughes v. Segal Enterprises, Inc.***, **627 F. Supp. 1231, 1238 (W.D. Ark. 1986); *Chariton Vet Supply, Inc. v. Moberly Motors Co.*, 2:08CV47MLM, 2009 WL 1011500 (E.D. Mo. Apr. 15, 2009).**

#### B.   Implied Warranties

10.   As a result of the sale of the WINDSPORT by Defendants to Plaintiffs, an implied warranty of merchantability arose in the transaction which included the guarantee that the WINDSPORT would pass without objection in the trade under the contract description; and that the

-5-

WINDSPORT was fit for the ordinary purpose for which such motor vehicles are purchased.

11.     Subsequent to the sale, an implied warranty arose in connection with the repairs performed by the Defendants.  Specifically, the Defendants impliedly warranted that the repair work had been performed in a good and workmanlike manner.

### C.     Express Warranties

12.     In addition to the implied warranties that arose in the transaction, certain representations and express warranties were made, including, that any malfunction in the WINDSPORT occurring during a specified warranty period resulting from defects, non-conformities, and conitions in material or workmanship would be repaired, and that repair work on the WINDSPORT had, in fact, repaired the defects, non-conformities, and conitions.

13.     Plaintiffs' purchase of the WINDSPORT was accompanied by express warranties offered by Defendants and extending to Plaintiffs.  These warranties were part of the basis of the bargain of Plaintiffs's contract for purchase of the WINDSPORT.

14.     The basic warranties covered any repairs or replacements needed during the warranty period due to defects, non-conformities, and conitions in factory materials or workmanship.  Any required adjustments would also be made during the basic coverage period.  All warranty repairs and adjustments, including parts and labor, were to be made at no charge.  Additional warranties were set forth in the TMC's and FORD's warranty booklet and owners manual.

### D.     Actionable Conduct

15.     In fact, when delivered, the WINDSPORT was defective in materials and workmanship, with such defects, non-conformities, and conitions being discovered shortly after purchase.  Many defects, non-conformities and conditions have occurred since purchase, including,

but not limited to those outlined below in the Plaintiffs' own words:

**"The following is a sequence of events and summary of what has occurred to the best of my memory, notes, and emails.**
**Please note: we live 183 miles from Katy, Texas.**

**August 23, 2021:**
**My wife Lisa Doucette and I drove to Camping World in Katy, Texas to look at a 2022 Thor Windsport 35M.**
**I test drove the motor home a short distance and it backfired. The "sales manager", Mike Glass, said, "It's a new engine designed by Ford to increase fuel economy. You must accelerate slowly."**
**I questioned the validity of his explanation. I thought it likely a minor problem like decomposed gas from long term storage, or perhaps a loose or faulty spark plug wire.**
**There were other minor factory defects we noticed. Mike Glass assured us that since it was new it came with a one year warranty and any defects would be repaired.**
**He showed us a few other RV's but we decided to purchase the Thor Windsport. We signed a preliminary purchase agreement and paid a $2500 deposit to hold the deal while they obtained the financing and fixed all the problems.**

**August 26, 2021:**
**Mike Glass called and said the financing was approved, and we should obtain an insurance waiver. We made an appointment to drive back to Katy, Texas on August 27, 2021 to sign the loan documents. I called the Good Sam RV insurance service who recommended purchasing insurance from Progressive Insurance. I called Progressive and bought a policy.**

**August 27, 2021:**
**We drove back to Katy Texas. We did an orientation inspection before we signed the loan documents.**
**There were several defects noted:**
**Scratch marks on various cabinets**
**Dinette bench frame and a storage drawer misaligned, chipped, and scratched**
**Kitchen drawer glass fascia had a large chip near the handle**

**Mike Glass assured us all defects found during the inspection would be repaired.**

-7-

After the inspection we met with Amy Fraser, finance manager, to sign the loan documents. While signing the loan documents, Lisa noticed a yellow paper entitled "WE OWE" at the bottom of the stack of papers. Under the column header "NAME OF ITEM OR SERVICE OWED", was a hand written note "SLIDE TOPPER". We were not told about this problem before we signed the documents.

Mike Glass again assured us that they would replace the missing protective cover for the bedroom slide and replace the kitchen drawer that had the dangerous chip in the glass fascia. There were other minor issues, but we hoped they would fix the critical defects. Mike Glass promised everything would be done by the next day.

Before we left, we asked if we could have a stacked washer/dryer and satellite dish and installed. The Product Specialist, Bryce Jewel, confirmed both could be installed that day while other repairs were being done. We drove home planning to return the next day and drive the RV home.

August 28, 2021:
We arrived at Camping World about 3:00PM. The washer/dryer and the satellite dish had been installed as Bryce Jewel promised; however, the installers had dented the front panel and damaged a control button on the front of the washer. They also left a pile of debris in between the wall and the laundry cabinet. Soon after, we were told the repairs had not been done because they were "waiting for parts."

I told Mike Glass I did not want to make another 400 mile round trip. I asked if another Camping World could make the repairs. Mike Glass and Bryce Jewel both said any Camping World dealer would do the repairs. Lisa and I were concerned about the missing slide cover because it protects the mechanism and the interior of the motor home from water and debris damage. Mike Glass insisted it was not necessary and no damage would occur. He insisted that slide covers are installed to stop pine needles from getting in the slide mechanism and had no other purpose. I did not accept that as a valid reason for not having a slide cover. I must confess August 28 was our 39th wedding anniversary and we were truly hoping we could take a trip in our "new" RV. We wanted to drive it home so I agreed to contact the New Braunfels

-8-

Camping World and arrange for the repairs. Both Mike Glass and Bryce Jewel said it would only be a few days to get the parts, and they would ship them to New Braunfels Camping World. New Braunfels is about 40 miles from our residence.

On the drive home about 50 miles out from Katy the motor home had to go up a hill. The engine immediately and repeatedly backfired, and it felt like the engine was jumping off the frame. Then the engine warning light came on. I pulled off the highway in to a rest area to call Mike Glass and ask about the problems. He laughed and said I was accelerating to fast. I told him I was traveling under 50 mph. I asked him about the engine warning light, he asked what color was the light. He said, "If it is red, you need to call a tow truck." I told him it was yellow, he assured me it was not a bad problem; just don't give it too much gas. I did not believe or trust what he said.

Lisa was following me in her car and had pulled over in the rest area. We talked about it and decided to keep going. The engine ran ok on a flat surface and down hill, but I had to slow down to 35-40 mph on uphill grades to prevent engine backfires.

When we arrived home, I called Camping World in New Braunfels to make an appointment. When I told them I bought the RV at Camping World in Katy, Texas, they said they could not do any warranty repairs because they did not sell Thor Windsport models. I called Thor customer service for advice. They confirmed it was a Texas state motor vehicle regulation concerning dealerships owned by the same company. I called Camping World in Katy and they said they would figure out a way to have it done. I never heard from them until September

August 29, 2021:
 August 29 was a Sunday. All the dealerships were closed but I hoped to salvage a bit of our anniversary. I found a campground about 83 miles from the house. It would give us some time together and we could make it like a break-in trip, to see if everything worked ok.

September 2, 2021:
I received a Cc of an email sent by Michael Glass to Kristen Ryland concerning contacting New Braunfels Camping World and setting up the repairs. I assume they were not able to

convince New Braunfels to do the repairs because I had no other communication with Katy Camping World.

September 3, 2021:
From August 31 thru September 3, I called every Ford dealer within 50 miles. I put the RV in a storage lot while I searched.

September 4, 2021:
I finally made an appointment with a Ford truck dealer to repair the engine problems. Cavender Grande Ford; 26 miles from our house. The appointment was initially scheduled for September 7, but I had to change it to September 8 because of a previous appointment.

September 8, 2021:
I brought the RV to Grande Ford.

September 11, 2021:
I emailed Bryce Jewel concerning photos of some of the damage and defects we found on the washer/dryer and to let her know the RV was at the Ford dealer being repaired.

September 21, 2021:
I received an email and replied to Ricky Clay, Parts and Service Director of Katy Camping World. He had requested more photos of defects. I sent him all the photos we had.

September 24, 2021:
Grande Ford had replaced all the spark plug wires and checked the chassis, no other problems found. The RV ran great, no backfires, no jumping engine. That is the only warranty issue repaired in a professional manner.

September 25, 2021:
I emailed Ricky Clay and Bryce Jewel informing them that the Ford dealer had repaired the engine problems.

After September 25, I called and emailed Camping World for updates on the repair parts several times. I spoke to several different service technicians and managers. There was no progress. Frustrated with the lack of service, I called Camping World's corporate office and complained. I also called Thor customer assistance.

**September 30, 2021:**
**I received an email from Timothy Murphy of Camping World confirming an appointment for October 11. I called him by phone to ask him if they had obtained the parts. He said no, but they would have them soon. I told him I did not want to bring it until they had the parts. I would have to make two 400 mile trips and the major repair work could be done in one day. I told him I would bring it in as soon as they had the parts. He agreed.**

**I also emailed Ricky Clay to tell him about the vinyl flooring near the passenger chair. It was loose from the decking and had formed a large bubble. I had no further contact with Camping World until I called them on October 25.**

**October 26, 2021:**
**We brought it back and listed all the repairs that had not been done on the service order. We have a copy of the service order.**

**November 4, 2021:**
**I had not heard from them since October 26, so I called the service manager and asked for an update.**
**He could not give me an estimate of when it would be done. They were still waiting on parts.**

**November 8, 2021:**
**I contacted the Texas DMV by email because I had not received the metal license plates.**

**November 10, 2101:**
**Texas DMV replied to the email and said the DMV had not received any registration documents and I should contact the dealer. I called them that day. The Camping World vehicle registration office said there was an error in the filing and they submitted a correction. "It should be there any day now".**

**I emailed the DMV office with the information about the error, and asked if there was any registration filed at all. He replied that if there was an error, perhaps the DMV office sent it back and they did not process it.**

**I don't think they have done any thing as of today."**

16.    Since purchase, Plaintiffs have returned their WINDSPORT to the Defendants for

repairs on numerous occasions.  Despite this prolonged period during which Defendants were given the opportunity to repair the WINDSPORT the more significant and dangerous conditions were not repaired.  Defendants failed to repair the WINDSPORT so as to bring it into conformity with the warranties set forth herein.  From the date of its purchase, the WINDSPORT continues to this day to exhibit some or all of the non-conformities described herein.

17.     The defects, non-conformities, and conitions experienced by Plaintiffs with the WINDSPORT substantially impaired its use, value and safety.

18.      Plaintiffs directly notified the Defendants of the defects, non-conformities and conditions of the WINDSPORT on numerous occasions.

### VI.     Causes of Action

**COUNT 1:  VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT**

19.     Plaintiffs re-allege and incorporate by reference herein each and every allegation set forth in the preceding paragraphs.

20.     Defendants violated the following provisions of the DTPA:

a.      §17.50(1): the use or employment of a false, misleading, or deceptive acts or practices as defined in §17.46(b)(5), §17.46(b)(6), §17.46(b)(7), §17.46(b)(9), §17.46(b)(12),    §17.46(b)(13),    §17.46(b)(20),    §17.46(b)(22)    and §17.46(b)(24) of the DTPA that were detrimentally relied upon by Plaintiffs;

b.      §17.50(2): breach of express warranty, as defined in §2.313 of the Tex Bus and Com Code (the warranty failed of its essential purpose and Plaintiffs were deprived of substantial value of bargain because the defect was not corrected within reasonable time);

c.      §17.50(2):  breach of the implied warranty to perform repairs in a good and workmanlike manner, as set forth in *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex. 1987);

d.      §17.50(2):  breach of the implied warranty of merchantability as defined in

-12-

§2.314 of the Texas Business and Commerce Code;

e.      §17.50(3): an unconscionable action or course of action as defined by §17.45(5); and

f.      §17.46(b)(12): misrepresenting agreements and legal rights.

21.      Because of the inherent defects in the WINDSPORT which defects existed at the time the WINDSPORT was sold although not discovered until later, the WINDSPORT was not merchantable in that it would not pass without objection in the trade under the contract description and it was not fit for the ordinary purpose for which such recreational vehicles are used. Furthermore, Defendants failed to perform the repair work in a good and workmanlike manner. This conduct by Defendants constitutes a breach of the implied warranties described above, which breach is actionable under DTPA § 17.50(a)(2).

22.      Defendants' statements that the WINDSPORT's defects would be and had been repaired misrepresented the characteristics, uses, benefits, standard and quality of Defendants' services. For this reason, these representations were false, misleading and deceptive as defined in DTPA § 17.46(b)(5) and (7); and this conduct is actionable under DTPA § 17.50(a)(1).

23.      The Defendants' acts or practices in the selling and/or repairing of the WINDSPORT to Plaintiffs were unconscionable actions or courses of action because they took advantage of the Plaintiffs' lack of knowledge, ability, experience, or capacity of the Plaintiffs to a grossly unfair degree. For this reason, this transaction was unconscionable and is actionable under DTPA § 17.50(a)(3).

24.      Plaintiffs further contend that Defendants' violations of the DTPA were committed knowingly and intentionally as those terms are defined in §17.45(9) and §17.45(13) of the DTPA

entitling Plaintiffs to seek civil penalties in trebling of their actual damages in accordance with the DTPA.

25.    This conduct was a producing and/or proximate cause of actual damages to Plaintiffs, as set forth below.

26.    Any purported waiver or limitation of rights under DTPA by the Defendants is a violation of public policy under §17.42.  WAIVERS:  PUBLIC POLICY:

(a)    Any waiver by a consumer of the provisions of this subchapter is contrary to public policy and is unenforceable and void;  provided, however, that a waiver is valid and enforceable if:

(1)    the waiver is in writing and is signed by the consumer;

(2)    the consumer is not in a significantly disparate bargaining position; and

(3)    the consumer is represented by legal counsel in seeking or acquiring the goods or services.

(b)    A waiver under Subsection (a) is not effective if the consumer's legal counsel was directly or indirectly identified, suggested, or selected by a Defendants or an agent of the Defendants.

(c)    A waiver under this section must be:

(1)    conspicuous and in bold-faced type of at least 10 points in size;

(2)    identified by the heading "Waiver of Consumer Rights," or words of similar meaning;  and

(3)    in substantially the following form

:

"I waive my rights under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Business & Commerce Code, a law that gives consumers special rights and protections.  After consultation with an attorney of my own selection, I voluntarily consent to this waiver.

(d)    The waiver required by Subsection (c) may be modified to waive only specified rights under this subchapter.

27.    Any purported limitation or reduction in the statute of limitations by the Defendants under DTPA must not be less than two years under the Texas Civil Practice and Remedies Code §16.070. Contractual Limitations Period:

(a)    Except as provided by Subsection (b), a person may not enter a stipulation, contract, or agreement that purports to limit the time in which to bring suit on the stipulation, contract, or agreement to a period shorter than two years. A stipulation, contract, or agreement that establishes a limitations period that is shorter than two years is void in this state.

(b)    This section does not apply to a stipulation, contract, or agreement relating to the sale or purchase of a business entity if a party to the stipulation, contract, or agreement pays or receives or is obligated to pay or entitled to receive consideration under the stipulation, contract, or agreement having an aggregate value of not less than $500,000.

28.    Under DTPA the statute of limitations is two years §17.565.  LIMITATION:

**All actions brought under this subchapter must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice.  The period of limitation provided in this section may be extended for a period of 180 days if the Plaintiffss proves that failure timely to commence the action was caused by the Defendants's knowingly engaging in conduct solely calculated to induce the Plaintiffss to refrain from or postpone the commencement of the action.**

29.    The limited remedy in Defendants' warranty fails of its essential purpose and deprives Plaintiffs of the substantial value of the bargain because Defendants or its authorized dealerships did not correct the defects within a reasonable time.  Tex. Bus. and Com. Code § 2.719.  Therefore, any purported limitation of remedies is ineffective.

30.    The exclusion of consequential and incidental damages is unconscionable and

therefore unenforceable.

31.    Plaintiffs seeks the remedy of rescission of the sales contract under §17.50(b)(3) and seeks an order necessary to restore to Plaintiffs any money or property, real or personal, which may have been acquired in violation of the Texas DTPA.

32.    As a direct and proximate result of Defendants' willful violation of its obligations under the DTPA, Plaintiffs have suffered actual, consequential and incidental damages, including but not limited to money expended on the purchase of the WINDSPORT, damages associated with the inconvenience suffered as a result of the complete failure of the  to operate properly, the loss of use of the  during the weeks it has been in the garage for repairs, the cost of repairs related to these defects, loss of wages, mental anguish and attorneys' fees.  Plaintiffs have incurred and will continue to incur in order to protect their rights in this matter.  The precise amount of damages is unknown at the present time but is estimated to be in excess of $500,000.00 and will be shown according to proof at trial.  Attorneys' fees, loss of use, interest, and other damages continue to accrue.

33.    Under the DTPA, Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses, including attorney's fees, if Plaintiffs prevails.  As a proximate result of Defendants' misconduct as alleged herein, and in an effort to protect their rights and to enforce the terms of the agreement as more particularly set forth above, it has become necessary for Plaintiffs to employ the legal services of Richard C. Dalton.  Plaintiffs have incurred and continues to incur legal fees, costs and expenses in connection therewith.


**COUNT 2:    BREACH OF IMPLIED WARRANTIES**

34.    Plaintiffs re-allege and incorporate herein by reference each and every allegation set

forth in the preceding paragraphs.

35.     The Defendants impliedly warranted that Plaintiffs' WINDSPORT was merchantable and fit and safe for their ordinary use, not otherwise injurious to consumers, and would come with adequate safety warnings.

36.     Because of the defects, Plaintiffs' WINDSPORT is unsafe and unfit for use and has caused economic loss to the Plaintiffs.  Therefore, the Defendants breached the implied warranty of merchantability.

37.     The damages Plaintiffs have suffered are a direct and proximate result of Defendants' actions in this matter include, but are not limited to, diminution in value of the vehicle; costs of repairs; expenses associated with returning the vehicle for repeated repair attempts; loss of wages; loss of use; damages; and attorney fees.

**COUNT 3:     NEGLIGENCE AND NEGLIGENT MISREPRESENTATION**

38.     The Defendants had a duty to Plaintiffs to provide a product reasonably safe in design and manufacture, warn of dangerous defects, disclose adverse material facts when making representations of fact to Plaintiffs and correct products which are defective.

39.     The Defendants breached its duty of reasonably care and duty to disclose material adverse facts to Plaintiffs by the following acts and omissions:

       **a.**     **Failure to design and manufacture a WINDSPORT that did not harbor the defects alleged herein;**

       **b.**     **Failure to notify Plaintiffs of the dangerous and defective condition of the WINDSPORT when Defendants knew or should have known of the dangerous and defective condition;**

       **c.**     **Failure to fulfill its duty to disclose the material adverse facts as set forth above and otherwise failing to exercise due care under the**

**circumstances; and**

**d.      Failure to repair the WINDSPORT in accordance with the express and implied warranties.**

40.      The damages Plaintiffs have suffered are a direct and proximate result of Defendants' actions in this matter include, but are not limited to, diminution in value of the vehicle; costs of repairs; expenses associated with returning the vehicle for repeated repair attempts; loss of wages; loss of use; damages; and attorney fees.

## COUNT 4:      BREACH OF CONTRACT

41.      Plaintiffs re-alleges and incorporate herein by reference each and every allegation set forth in the preceding paragraphs.

42.      Plaintiffs would show that the actions and/or omissions of Defendants described herein above constitute breach of the sales contract and breach of the repairs for which Plaintiffs paid Defendants to perform on their WINDSPORT, which proximately caused the direct and consequential damages to Plaintiffs described herein below, and for which Plaintiffs  hereby sues.

43.      The damages Plaintiffs have suffered are a direct and proximate result of Defendants' actions in this matter include, but are not limited to, diminution in value of the vehicle; costs of repairs; expenses associated with returning the vehicle for repeated repair attempts; loss of wages; loss of use; damages; and attorney fees.

## COUNT 5:      NEGLIGENT REPAIR

44.      Plaintiffs re-allege and incorporate herein by reference each and every allegation set forth in the preceding paragraphs.

45.      On numerous occasions, Plaintiffs delivered the WINDSPORT to Defendants for

repairs of the defective conditions in his WINDSPORT.

46.     On each occasion that Plaintiffs returned the WINDSPORT for repairs, Plaintiffs were informed and believe, and thereupon allege, that Defendants attempted repairs of the WINDSPORT pursuant to its obligations, contract, payments and implied warranties. Defendants owed a duty of care to Plaintiffs to perform the repairs on the WINDSPORT in a good and workmanlike manner within a reasonable time.  Defendants breached this duty.

47.     Defendants's attempted repairs of Plaintiffs's WINDSPORT were done so negligently, carelessly, and recklessly as to substantially impair the WINDSPORT's use, value, and safety in its operation and use.  In fact, Defendants's final repair caused the WINDSPORT to sink.

48.     At no repair attempt was Plaintiffs' WINDSPORT fully and completely repaired by Defendants, nor were many of the conditions of which Plaintiffs complained fixed or significantly improved by Defendants' attempts at repairs.  Nonetheless, each time Plaintiffs picked up the WINDSPORT after Defendants' repair attempts, Defendants represented to Plaintiffs that the repairs were complete, and Plaintiffs relied upon these representations.

49.     As a direct and proximate result of Defendants' negligent failure to repair the WINDSPORT within a reasonable time or within a reasonable number of attempts, Defendants caused the WINDSPORT to sink.

50.     As a further direct and proximate result of Defendants' failure to repair the WINDSPORT in a timely and workmanlike fashion, Plaintiffs were forced repeatedly to take the WINDSPORT in for further repair attempts and to leave the WINDSPORT for long periods of time at great inconvenience to themselves, and Plaintiffs sustained actual damages.

51.     The damages Plaintiffs have suffered are a direct and proximate result of Defendants'

actions in this matter include, but are not limited to, diminution in value of the vehicle; costs of repairs; expenses associated with returning the vehicle for repeated repair attempts; loss of wages; loss of use; damages; attorney fees and damages to Plaintiffs's health and well-being in the form of emotional distress.

**COUNT 6:    VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**

52.    Plaintiffs re-allege and incorporate by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

53.    Plaintiffs are "consumers" as defined in the Magnuson-Moss Warranty Act (hereinafter "Warranty Act"), 15 U.S.C. § 2301(3).

54.    Defendants are "suppliers" and "warrantors" as defined in the Warranty Act, 15 U.S.C. § 2310(4) and (5).

55.    The WINDSPORT, hereinabove, described is a "consumer product" as defined in the Warranty Act, 15 U.S.C. § 2301(l), because it is normally used for personal purposes and Plaintiffs in fact purchased it wholly or primarily for personal use.

56.    The express warranties more fully described hereinabove pertaining to the WINDSPORT is a "written warranty" as defined in the Warranty Act, 15 U.S.C. § 2301(6).

57.    The actions of Defendants and each of them as hereinabove described, in failing to tender the WINDSPORT to Plaintiffs free of defects and refusing to repair or replace the defective WINDSPORT tendered to Plaintiffs constitute a breach of the written and implied warranties covering the WINDSPORT and hence a violation of the Magnuson-Moss Warranty Act.

58.    Plaintiffs have performed all things agreed to and required of them under the purchase agreement and warranty, except as may have been excused or prevented by the conduct of

Defendants as herein alleged.

59.     As a direct and proximate result of the acts and omissions of Defendants and each of them as set forth hereinabove, Plaintiffs have been damaged hereinabove in an amount in excess of $500,000.00 according to proof at trial.

60.     Pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover as part of the judgment, costs and expenses of the suit including attorney's fees based on actual time expended.  As a proximate result of the misconduct of Defendants as alleged herein, and in an effort to protect their rights and to enforce the terms of the agreement as more particularly set forth above, it has become necessary for Plaintiffs to employ the legal services of Richard C. Dalton.  Plaintiffs have incurred and continue to incur legal fees, costs and expenses in connection therewith.

**VII.     Economic and Actual Damages**

61.     Plaintiffs sustained the following economic and actual damages as a result of the actions and/or omissions of Defendants described herein above:

a.      Out-of-Pocket Rule. Recovery of the difference between the price paid and the actual value of the property acquired.

b.      Benefit of the Bargain Rule.  The difference between the value of the goods and services would have had if they had been as promised and their value as delivered.

c.      Costs of Repairs.

d.      Loss Profits.

e.      Loss of Use.

f.      Diminished or reduced market value.

-21-

g.      Damages for Mental Anguish.

## VIII.   Damages for Mental Anguish

62.      Plaintiffs would further show false, misleading and deceptive acts, practices and/or omissions described herein above were committed "knowingly," as provided by Section 17.45(9) of the Texas Business and Commerce Code, in that Defendants had actual awareness of the falsity, deception, or unfairness of such acts, practices, and/or omissions.

63.      As a result of such acts, practices and /or omissions, Plaintiffs sustained a high degree of mental pain and distress of such nature, duration and severity that would permit the recovery of damages for mental anguish pursuant to Section 17.50(b) of the Texas Business and Commerce Code, and for which Plaintiffs hereby sues in an amount in excess of the minimum jurisdictional limits of this Court.

## IX.   Request for Rescission of the Sale under Texas DTPA §17.50(b)(3)

64.      Plaintiffs are seeking a rescission of the sale under Texas DTPA §17.50(b)(3) and is seeking an order necessary to restore to him any money or property, real or personal, which may have been acquired in violation of the Texas DTPA.

65.      Accordingly, Plaintiffs seek a cancellation of the purchase transaction and an order of the court restoring to him the money obtained by Defendants as a result of its breach of Texas DTPA as set forth above.  Plaintiffs also seek cancellation of the debt and now offers to return the WINDSPORT to Defendants.

## X.   Multiple Damages

66.      The Defendants' conduct in violation of the DTPA was committed knowingly, as that

term is defined under Texas DTPA in that Defendants had actual awareness of the falsity, deception, or unfairness of such acts, practices, and/or omissions.

67.     Plaintiffs further show that such acts, practices, and/or omissions were committed "intentionally" in that Defendants specifically intended that Plaintiffs act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness.

68.     Therefore, Plaintiffs are entitled to recover multiple damages as provided by §17.50(b)(1) of the Texas Business and Commerce Code in an amount not to exceed three times the amount of his economic damages.

### XI.     Attorney Fees and Costs

69.     Plaintiffs are entitled to recover as part of the judgment, costs and expenses of the suit including attorney's fees based on actual time expended.  As a proximate result of the misconduct of Defendants as alleged herein, and in an effort to protect their rights and to enforce the terms of the agreement as more particularly set forth above, it has become necessary for Plaintiffs to employ the legal services of Richard C. Dalton.  Plaintiffs have incurred and continue to incur legal fees, costs and expenses in connection therewith.

### XII.     Grounds for Tolling or Suspend Accrual of Limitations

70.     Plaintiffs pleads the doctrine of equitable estoppel applies in this matter as the Defendants' actions prevented the Plaintiffs from obtaining adequate knowledge to pursue their claims and, therefore, equity will toll the statute of limitations until equitable grounds cease to operate as a reason for delay.

71.     Plaintiffs also affirmatively pleads the WINDSPORT rule under Texas DTPA.  The WINDSPORT rule operates to toll the statutes of limitations until the Plaintiffs discovers, or through

the exercise of reasonable care and diligence should have discovered, facts indicating that he has been injured. *Burbank v. Compass Bank*, 2016 WL 7665431, at 7 (E.D. Tex. Sept. 29, 2016) (citation omitted). "In essence, the Legislature codified the WINDSPORT rule for DTPA claims." *Gonzales v. Southwest Olshan Found. Repair Co., LLC*, 400 S.W.3d 52, 57-58 (Tex. 2013) (citation omitted); Tex. Bus. & Com. Code §17.565 ("All actions…must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred ***or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice.***"). [Emphasis Added]

72.     Plaintiffs affirmatively plead that none of the causes of action have accrued because of the continuing-tort doctrine.  Under this doctrine, if a Defendants commits a continuing tort, a cause of action never begins to accrue until the tortuous conduct ceases.

## XIII.   Prayer

73.     For these reasons, Plaintiffs pray for judgment against the Defendants for the following:

     a.    For general, special and actual damages according to proof at trial;

     b.    Rescinding the sale of the 2022 THOR WINDSPORT 35M CLASS MOTORHOME bearing VIN: 1F66F5DN3L0A13490 under Texas DTPA §17.50(b)(3) and an order necessary to restore to Plaintiffs any money or property, real or personal, which may have been acquired in violation of the Texas DTPA and returning to Plaintiffs the purchase price including all collateral costs at the time of the sale, any and all finance charges, insurance premiums, maintenance costs, repair costs, and damages;

     c.    For incidental and consequential damages according to proof at trial;

     d.    Out of pocket damages for expenditures related to any cost of repairs, deductibles; and towing charges.

e.      Any diminution in value of the WINDSPORT attributable to the defects;

f.      Past and future economic losses;

g.      Prejudgment and post-judgment interest;

h.      Damages for loss of use of the WINDSPORT;

i.      Civil Penalties and/or Punitive damages;

j.      Damages for mental anguish;

k.      Attorney fees;

l.      Costs of suit, expert fees and litigation expenses; and

m.      All other relief the Arbitrator deems appropriate.

**XIV.    Demand for Jury Trial**

74.      Plaintiffs hereby demand a trial by jury to the extent authorized by law.

RESPECTFULLY SUBMITTED:

BY: /s/ *Richard C. Dalton*

Richard C. Dalton
Texas Bar No. 24033539
Louisiana Bar No. 23017
California Bar No. 268598
P.O. Box 358
Carencro, Louisiana 70520
rick@rickdalton.law
(337) 371-0375

ATTORNEY FOR PLAINTIFFS